IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No. 01-cv-01854-LTB

LAWRENCE GOLAN;
ESTATE OF RICHARD KAPP;
S.A. PUBLISHING CO., INC., d/b/A ESS.A.Y. RECORDINGS;
SYMPHONY OF THE CANYONS;
RON HALL, d/b/A FESTIVAL FILMS; and
JOHN McDONOUGH, d/b/a TIMELESS VIDEO ALTERNATIVES INTERNATIONAL,

   Plaintiffs,

v.

ERIC H. HOLDER, JR., in his official capacity as Attorney General of the United States; and MARYBETH PETERS, in her official capacity as Register of Copyrights, Copyright Office of the United States,

   Defendants.
_____

**MEMORANDUM OPINION AND ORDER**
_____

Babcock, J.

  This case—as now presented—concerns the validity of Section 514 of the Uruguay Round Agreements Act ("URAA"), 17 U.S.C. § 104A. Section 514 restores the United States copyrights of foreign authors who lost those rights to the public domain for any reason other than the expiration of a copyright term. Plaintiffs filed this suit in September 2001, asserting claims challenging Section 514—as well as the Copyright Term Extension Act of 1998—under the Copyright Clause and the First Amendment. This Court granted summary judgment in favor of the Government or dismissal as to each of those claims. [**Docket ## 28, 109**]. On appeal, the Tenth Circuit affirmed this Court's rulings as to Plaintiffs' Copyright Term Extension Act claims and Plaintiffs' Copyright Clause claims, but reversed this Court's rulings as to Plaintiff's First

Amendment challenge to Section 514. *See Golan v. Gonzales*, 501 F.3d 1179 (10th Cir. 2007). The Tenth Circuit remanded to this Court with instructions to assess whether Section 514—which the Tenth Circuit determined interfered with Plaintiffs' "First Amendment interest in using works in the public domain"—passed First Amendment scrutiny. The parties have filed cross-motions for summary judgment on this issue [**Docket ## 147, 148**] as well as responses/replies [**Docket ## 154, 155**]. An *amicus* brief was filed in support of the Government [**Docket # 152**]. The motions are adequately briefed and oral argument would not materially assist their determination. After consideration of the motions, the papers, and the case file, and for the reasons stated below, I GRANT Plaintiffs' motion [**Docket # 148**] and DENY the Government's motion [**Docket # 147**].

## I. BACKGROUND

Plaintiffs in this case represent a broad range of artisans and businesses that rely upon works in the public domain for their trade. As relevant to the issue presented here, these works were produced by foreign authors and, for varying reasons—including the authors' failure to renew the copyrights with the Copyright Office, or failure to include a notice of copyright on the copyrighted works—did not enjoy copyright protection in the United States prior to the enactment of the URAA in 1994. Section 514 of the URAA ostensibly implements Article 18 of the Berne Convention for the Protection of Literary and Artistic Works—an international treaty first enacted in 1886, but not joined by the United States until 1988. Article 18 requires member nations to provide copyright protection to works by foreign authors so long as the term of copyright protection in the country of origin has not expired as to a specific work. *See* Berne Convention, Art. 18. Section 514 of the URAA—by granting copyright protection to these

2

foreign authors—removed from the public domain the works upon which Plaintiffs relied. As the subject works are now protected by United States copyright laws, Plaintiffs find themselves in the position of having to either pay for their previously royalty-free use, or cease using the works altogether. Plaintiffs argue their First Amendment rights were violated by Congress when these works were removed from the public domain.

On April 20, 2005, I granted summary judgment to the Government on Plaintiffs' First Amendment claims, holding: "I see no need to expand upon the settled rule that private censorship via copyright enforcement does not implicate First Amendment concerns." [**Docket # 109**]. On appeal, the Tenth Circuit reversed, holding: "since § 514 has altered the traditional contours of copyright protection in a manner that implicates plaintiffs' right to free expression, it must be subject to First Amendment review." *Golan*, 501 F.3d at 1197.

## II. TENTH CIRCUIT OPINION

The Tenth Circuit began its review with an outline of basic principles of copyright law and how those principles interconnect with the First Amendment:

> Under the Copyright Clause, Congress may "promote the Progress of Science and useful Arts, by securing for limited Times to Authors . . . the exclusive Right to their [respective] Writings." U.S. CONST. art. I, § 8, cl. 8. . . . "[O]nce the . . . copyright monopoly has expired, the public may use the . . . work at will and without attribution." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 33–34 (2003). These imaginative works inspire new creations, which in turn inspire others, hopefully, *ad infinitum*. This cycle is what makes copyright "the engine of free expression." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985).
>
> Congress's power to bestow copyrights is broad. *See Eldred v. Ashcroft*, 537 U.S. 186, 205 (2003) ("[I]t is Congress that has been assigned the task of defining the scope of the limited monopoly that should be granted to authors . . . in order to give the public appropriate access to their work product.") (internal quotation marks omitted). But it is not boundless. . . . The Supreme Court has recognized that the First Amendment can limit Congress's power under the Copyright

3

> Clause. *Id*. at 219–21 (indicating that copyright acts are not "categorically immune from challenges under the First Amendment") (internal quotation marks omitted). The Court has emphasized, however, that "copyright's built-in First Amendment accommodations"—the idea/expression dichotomy and the fair use defense—generally protect the public's First Amendment interest in copyrighted works. *Id*. at 219–20.
>
> Although these built-in free speech safeguards will ordinarily insulate legislation from First Amendment review, the *Eldred* Court indicated that such review is warranted when an act of Congress has "altered the traditional contours of copyright protection." *Id*. at 221. The Court did not define the "traditional contours of copyright protection." However, as we discuss in detail below, one of these traditional contours is the principle that once a work enters the public domain, no individual—not even the creator—may copyright it.

*Golan*, 501 F.3d at 1183–84.

In reaching its conclusion that Section 514—by removing works from the public domain—"altered the traditional contours of copyright protection," the court first noted "the bedrock principle of copyright law that works in the public domain remain there." *See Golan*, 501 F.3d at 1187. Indeed, the primary purpose of the Copyright Clause is to incentivize authors to produce works to benefit the public good. *See id.* at 1188. Once a work is created, a copyright attaches that allows the author to restrict the use of the work for the duration of the copyright period—at which point the work enters the public domain for the free use of anyone. *See id*. at 1189. This incentive drives "the engine of free expression" enshrined in the First Amendment. *See id*. at 1188.

Section 514 altered the traditional copyright scheme such that "the copyright sequence no longer necessarily ends with the public domain: indeed, it may begin there." *See id*. at 1189. Such an alteration is inconsistent with the copyright scheme as designed by the Framers and as implemented by Congress in the ensuing years. *See id*. at 1190–92. Accordingly, "[Section] 514 deviates from the time-honored tradition of allowing works in the public domain to stay there."

4

*Id.* at 1192.

Having established that Section 514 "altered the traditional contours of copyright protection"—therefore requiring First Amendment review, *see Eldred v. Ashcroft*, 537 U.S. 186, 221 (2003)—the Tenth Circuit turned to the question of how the alteration affected the First Amendment rights of Plaintiffs. The court first noted that Plaintiffs had, subject to constitutionally permissible restraints, a non-exclusive right to "unrestrained artistic use of these works" that was protected by the First Amendment. *See Golan*, 501 F.3d at 1193. Section 514 interfered with this right by making the cost of using the works prohibitive. *See id.* Distinguishing Plaintiffs' case from that at issue in *Eldred*, the court noted that the *Eldred* plaintiffs did not have a right to copy the works at issue. *See id.* ("As the *Eldred* Court observed, the most the *Eldred* plaintiffs could show was a weak interest in 'making other people's speeches.' By contrast, the speech at issue here belonged to plaintiffs when it entered the public domain."). The court concluded "that once the works at issue became free for anyone to copy, plaintiffs in this case had vested First Amendment interests in the expressions, and § 514's interference with plaintiff's rights is subject to First Amendment scrutiny." *Id.* at 1194.

Finally, the Tenth Circuit considered whether "copyright's built-in First Amendment accommodations"—the idea/expression dichotomy and the fair use defense—were, when combined with the additional protections explicitly included in Section 514, adequate to protect Plaintiffs' First Amendment interests. Addressing the idea/expression dichotomy, the court found the rule to be inapplicable to Plaintiffs' case because Plaintiffs' interest was in the expressions themselves, not merely the underlying ideas. *See id.* at 1194. Addressing the fair use doctrine, the court found the doctrine to be an insufficient substitute for the unlimited use

5

allowed once a work was in the public domain. *See id.* at 1195. The court then held Section 514's "supplemental protections"—which include a one-year safe harbor provision and a provision allowing the continued use of derivative works, if a reasonable royalty is paid—inadequate to insulate Section 514 from a First Amendment challenge. *See id.* at 1196; *see also Eldred*, 537 U.S. at 221. The court remanded with instructions to apply a First Amendment analysis.

### III. STANDARD OF REVIEW

#### A. First Amendment Review

As mandated by the Tenth Circuit, the initial inquiry in my First Amendment analysis is "whether § 514 is content-based or content-neutral." *See Golan*, 501 F.3d at 1196. Content-based restrictions on speech are those which "suppress, disadvantage, or impose differential burdens upon speech because of its content." *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 657 (10th Cir. 2006) (internal citations and quotations omitted). These restrictions "are subject to the most exacting scrutiny." *See id.* If Section 514 is a content-based restriction, I must consider whether the Government's interest in promulgating the restriction is truly "compelling" and whether the Government might achieve the same ends through alternative means that have less of an effect on protected expression. *See United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 813 (2000). By contrast, "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). A content-neutral restriction must be "narrowly tailored to serve a significant governmental interest." *Id.* (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288,

293 (1984)).

The parties both argue Section 514 is content-neutral. I agree. A restriction will be considered content-neutral when it can be justified without reference to the content of the speech restricted. *See Boos v. Barry*, 485 U.S. 312, 320 (1988) (citing *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976)). Here, the speech restricted is a general category of speech—namely, speech created by foreign authors. The justification for the restriction lies in the protection of the authors' interests in the expressions themselves, not the ideas the works encompass. Accordingly, Section 514 must be reviewed under the "content-neutral" standard. *See Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 643 (1994) ("*Turner I*").

"A content-neutral regulation [of speech] will be sustained under the First Amendment if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 189 (1997) ("*Turner II*"). While a content-neutral restriction must be "narrowly tailored to serve a significant government interest" unrelated to the suppression of free speech, it "need not be the least restrictive or least intrusive means of doing so." *See Ward*, 491 U.S. at 791, 798. The requirement of narrow tailoring is satisfied so long as the restriction promotes a substantial government interest that would be achieved less effectively absent the restriction. *See id.* at 798–99.

Review of Congress's judgment is deferential; the only relevant question is whether, in formulating its judgment, Congress has drawn reasonable inferences based on substantial evidence. *See Turner I*, 520 U.S. at 195. "So long as the means chosen are not substantially broader than necessary to achieve the government's interest," the restriction will not be invalid simply because "the government's interest could be adequately served by some less-speech-restrictive alternative." *Ward*, 491 U.S. at 800.

When determining whether a regulation of speech is "substantially broader than necessary to achieve the government's interest," the Court asks whether the regulation suppresses a substantial amount of protected speech judged in relation to the Government's legitimate interest. *See Virginia v. Hicks*, 539 U.S. 113, 118–19, 122–23 (2003). This requires a balancing of Plaintiffs' interests with those of the Government. *See United States v. Williams*, 128 S. Ct. 1830, 1838 (2008). The first step is to construe the challenged statute to determine the scope of the speech the statute affects. *See id.* The second step is to determine the scope of protected expressive activity necessarily suppressed by the statute's terms. *See id.* at 1841. If the statute "leaves unprotected a substantial amount of speech not tied to the Government's interest . . . it is overbroad and unconstitutional." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 256 (2002).

B. Summary Judgment

In a motion for summary judgment, the moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue

8

of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting FED. R. CIV. P. 56(c)). If this burden is met, then the non-moving party has the burden of showing there are genuine issues of material fact to be determined. *See id.* at 322. It is not enough that the evidence be merely colorable; the non-moving party must come forward with specific facts showing a genuine issue remains. *See id.*; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). I shall grant summary judgment, therefore, only if the pleadings, depositions, answers to interrogatories, admissions, or affidavits—construed viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor—show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir. 1992); *Lucas v. Mountain States Tel. & Tel.*, 909 F.2d 419, 420 (10th Cir. 1990); FED. R. CIV. P. 56(c).

In a motion for summary judgment, I view the evidence "through the prism of the substantive evidentiary burden." *Liberty Lobby*, *supra*, 477 U.S. at 254. The inquiry is based on "the quality and quantity of evidence required by the governing law" and "the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant." *Id*. Where—as here—the parties file cross-motions for summary judgment, I am entitled to assume that no evidence needs to be considered other than that filed by the parties. *See Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000). Nonetheless—as cross-motions for summary judgment are to be treated separately—the denial of

9

one does not necessarily require the grant of the other. *See id*.

Although this case is presented in the light of summary judgment, the Court must still accord substantial deference to the predictive judgment of Congress. *See Turner I*, 512 U.S. at 666. In this context, the question is whether Congress based its decision on reasonable inferences and substantial evidence. *See id*. As long as there is no material dispute that there is substantial evidence from which Congress could have drawn a reasonable inference, then the government is entitled to summary judgment even if the evidence could reasonably lead to an inconsistent conclusion. *See Turner II*, 520 U.S. at 1196. If, however, Plaintiffs show the Government is unable to proffer such evidence, Plaintiffs are entitled to summary judgment. *See Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993); *Sable Commc'ns of California, Inc. v. F.C.C.*, 492 U.S. 115, 129–30 (1989).

## IV. ANALYSIS

The burden is on the Government to show it has a significant interest that is protected by limiting Plaintiffs' speech and that Section 514 does not burden substantially more speech than necessary to further the Government's interest. *See Turner I*, 512 U.S. at 664–65. The Government proffers three interests allegedly served by Section 514: (1) Section 514 brings the United States into substantial compliance with its international treaty obligations under the Berne Convention; (2) Section 514 helps protect the copyright interests of United States authors abroad; and (3) Section 514 corrects for historic inequities wrought on foreign authors who lost their United States copyrights through no fault of their own.

### A. Compliance with the Berne Convention

It is not disputed that the Berne Convention requires the restoration of copyrights to

foreign authors. While compliance with international treaty obligations represents an important governmental interest, "[a]t the same time, it is well established that 'no agreement with a foreign nation can confer power on the Congress, or on any other branch of Government, which is free from the restraints of the Constitution.'" *Boos*, 485 U.S. at 324 (quoting *Reid v. Covert*, 354 U.S. 1, 16 (1957)); *see Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 438 (2006). Accordingly, I must ask whether Section 514 meets the requirements of the Berne Convention in a manner that is not "substantially broader that necessary to achieve the government's interest." *See Ward*, 491 U.S. at 800. In determining whether Section 514 is "substantially broader than necessary," I must balance the Government's interest against that of Plaintiffs. *See Williams*, 128 S. Ct. at 1838.

As noted by the Tenth Circuit, Section 514 was inconsistent with the United States copyright scheme as designed by the Framers and as implemented by Congress in the ensuing years. *See Golan*, 501 F.3d at 1190–92. Moreover, Section 514 interfered with Plaintiffs' vested First Amendment rights to unrestrained use of the restored works. *See id.* at 1193–94. The Government argues under *Eldred* that Plaintiffs have a diminished interest in the restored works because Plaintiffs were not the original authors. *See Eldred*, 537 U.S. at 221 ("The First Amendment securely protects the freedom to make—or decline to make—one's own speech; it bears less heavily when speakers assert the right to make other people's speeches."). The Tenth Circuit, however, was not persuaded by this argument and distinguished Plaintiffs' case from that at issue in *Eldred*, holding: "plaintiffs' First Amendment interests in public domain works are greater than the interests of the *Eldred* plaintiffs. The *Eldred* plaintiffs did not—nor had they ever—possessed unfettered access to any of the works at issue there. . . . By contrast, the speech

11

at issue here belonged to plaintiffs when it entered the public domain." *See Golan*, 501 F.3d at 1193. Unlike the plaintiffs in *Eldred*, therefore, Plaintiffs here did not have an amorphous and prospective "trivial interest" in property that belonged to someone else, but instead had "vested First Amendment interests in the expressions" contained in the works themselves. *See id.* at 1188, 1194. The Tenth Circuit considered Plaintiffs' interests "near the core of the First Amendment." *See id.* at 1193. The impact of removing the restored works without accommodating Plaintiff's reliance interests is substantial. *See Golan*, 501 F.3d at 1182 (noting the added expense to Plaintiffs of complying with Section 514 made the exercise of their First Amendment rights costs prohibitive). Accordingly, I do not find the Government's argument persuasive and conclude Plaintiffs' interests in copying the works at issue is deserving of full First Amendment protection.

Having determined the scope of the Government's interest and Plaintiffs' interest, I now turn to the question whether Section 514 "leaves unprotected a substantial amount of speech not tied to the Government's interest." *See Ashcroft*, 535 U.S. at 256. As noted by the Government, Plaintiffs' First Amendment speech is not entirely unprotected under Section 514. Plaintiffs—in addition to the protections afforded under the "traditional contours of copyright protection"—are immunized from liability for acts of copying occurring before restoration and are entitled to continue copying so long as the original author does not file notice of intent to enforce his or her copyrights. Plaintiffs are also entitled to sell or otherwise use copies of restored works for one year, and may continue to exploit derivative works forever, so long as a reasonable royalty is paid. What speech remains unprotected under Section 514, therefore, is any speech that involves copying more than one year after notice has been filed, and any derivative works made after

12

notice is filed and without payment of a royalty. When compared to the limited amount of speech that remains protected under Section 514, other than speech already protected by the idea/expression dichotomy and the fair use doctrine—speech that the Government concedes cannot be limited by its interest in complying with the Berne Convention—the amount unprotected is clearly "a substantial amount." *See Ashcroft*, 535 U.S. at 256. I therefore ask whether the unprotected speech is "not tied to the Government's interest" in complying with the Berne Convention. *See id.*

I begin by noting that the Berne Convention does not provide any direct reference to the question at issue here: whether or how member nations should accommodate "reliance parties"—namely, those persons with a vested interest in previously public-domain works—once the affected works are removed from the public domain and placed into the domain of copyright protection. To the extent Berne addresses this issue at all, the determination is left to the member nations: "respective countries shall determine, each in so far as it is concerned, the conditions of application of this principle." *See* Berne Convention, Art. 18(3).

I read Article 18, Section 3, as a grant of discretion to member nations to implement the Berne Convention's directive—that the copyrights of foreign authors be restored so long as the term of copyright protection in the country of origin has not expired—in light of each member nation's established corpus of copyright law. Such discretion is not limited by Article 18, Section 3, so long as the directive is applied within the bounds of existing law. *See* Fiscor Report, Part E [**Docket # 147-4**]. In the United States, for example, it is not disputed that the restored copyrights must still be subject to the well-established First Amendment exceptions afforded by the fair-use doctrine and the idea/expression dichotomy. *See Golan*, 501 F.3d at

13

1194–95.

While the Government proffers an expert opinion stating that Article 18, Section 3, requires such accommodations be temporary in nature—*see* Fiscor Report, Part E [**Docket # 147-4**]—nothing in the Berne Convention indicates this is necessarily the case. Several member nations—including Germany, Hungary, the United Kingdom, Australia, and New Zealand—provide accommodations that are temporally permanent so long as certain conditions are met. *See* Ficsor Report, Part F [**Docket # 147-4**]. While these member nations imposed various schemes limiting the rights of reliance parties, none of these nations restored copyrights in the subject works in a manner that was equivalent—either in force or in time—to copyrights in those works that had not fallen into the public domain. *See* Ficsor Report, Part F [**Docket # 147-4**].

Congress itself—by affording reliance parties certain protections in Section 514 that went beyond those normally required to accommodate copyright law and First Amendment concerns—implicitly recognized that Article 18, Section 3, does not require the full restoration of equivalent copyrights. *See* 17 U.S.C. § 104A(d). Some of these protections—such as allowing reliance parties to use restored works for an unlimited period of time if the author fails to file a notice of intent to enforce his copyright, and allowing reliance parties to use derivative works for so long as a reasonable royalty is paid to the original author—are temporally permanent in nature. Although, as noted by the Tenth Circuit, none of these provisions are adequate to fully protect Plaintiffs' First Amendment interests, they provide some protection beyond that which a normal copyright would allow. *See Golan*, 501 F.3d at 1193–94. By enacting such protections, Congress demonstrated it understood the broad latitude provided

member nations to protect reliance parties—even for an unlimited amount of time.

In light of the discretion afforded it by Article 18, Section 3, Congress could have complied with the Berne Convention without interfering with a substantial amount of protected speech—for example, by permanently "excepting parties, such as plaintiffs, who have relied upon works in the public domain," *see Golan*, 501 F.3d at 1196; *see also* Ridder Dec. Ex. A [**Docket # 150-9**].  Accordingly—to the extent Section 514 suppresses the right of reliance parties to use works they exploited while the works were in the public domain—Section 514 is "not tied to the Government's interest" in complying with the Berne Convention.  *See Ashcroft*, 535 U.S. at 256.  Section 514 is therefore "substantially broader than necessary to achieve the government's interest."  *See Ward*, 491 U.S. at 800.  Resolution of this question of law shows summary judgment in favor of Plaintiffs and against the Government is appropriate on this issue.  *See Mares*, 971 F.2d at 494; FED. R. CIV. P. 56(c).

### B.  Protection of United States Authors' Copyrights Abroad

Although the Government argues Section 514 serves the additional important Government interest of protecting the copyrights of United States authors abroad, this justification is largely intertwined with its argument regarding compliance with Article 18 of the Berne Convention—a justification which has been rejected as insufficient to justify the infringement of Plaintiffs' First Amendment rights above.  It is unnecessary to readdress these concerns here.

In addition to Article 18, however, the Government also argues Section 514 is necessary to protect United States authors from reprisal under Article 6.  Article 6 states:

> Where any country outside the Union fails to protect in an adequate manner the works of authors who are nationals of one of the countries of the Union, the latter

15

> country may restrict the protection given to the works of authors who are, at the date of the first publication thereof, nationals of the other country and are not habitually resident in one of the countries of the Union. If the country of first publication avails itself of this right, the other countries of the Union shall not be required to grant to works thus subjected to special treatment a wider protection than that granted to them in the country of first publication.

By its own terms, Article 6 allows sanctions only against a "country *outside the Union* [that] fails to protect in an adequate manner the works of authors who are nationals of one of the countries of the Union." (emphasis added). As the United States is "one of the countries of the Union," Article 6 provides no basis for sanctions to be levied against United States authors. Accordingly, compliance with Article 6 cannot provide an important Government interest. *See Turner I*, 512 U.S. at 664 ("when the Government defends a regulation on speech as a means to . . . prevent anticipated harms, it must . . . demonstrate that the recited harms are real, not merely conjectural").

The Government next appears to argue that Section 514—to the extent it suppresses the right of reliance parties to use works they exploited while the works were in the public domain—serves an important Government interest because it protects American authors whose works had entered the public domain of other countries from having those public domain works exploited by reliance parties in those countries. Although the precise contours are not clear, the essence of this argument appears to be an assumption that Section 514 will encourage other countries to limit the rights of reliance parties, despite—as held above—having no obligation to do so under the Berne Convention.

In support of its argument, the Government proffers evidence of the economic impact caused by foreign piracy of copyrighted United States works. The Government's evidence, however, focuses on the prior reluctance of foreign nations to protect American works unless the

16

United States implemented Article 18 of the Berne Convention. The Government proffers no evidence showing how suppression of reliance parties' First Amendment rights will lead to suppression of reliance parties' rights in foreign nations, or how such suppression will provide a "direct and material" benefit to United States authors. *See Turner I*, 512 U.S. at 664.

The Supreme Court teaches that—while Congress's predictive judgments are entitled to substantial deference—a court must "assure that, in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence." *See id.* at 665–66. When Congress "trench[es] on first amendment interests, even incidentally, the government must be able to adduce either empirical support or at least sound reasoning on behalf of its measures." *See id.* at 666 (quoting *Century Commc'ns Corp. v. FCC*, 835 F.2d 292, 304 (D.C. Cir. 1987)). This requires an analysis of evidence speaking to the precise question at issue. *See id.* at 666–67. Without the benefit of specific factual data supporting Congress's reasoning, a court "cannot determine whether the threat is real enough" to constitute an important Government interest, or whether the remedy chosen is sufficiently narrow to overcome a First Amendment challenge. *See id.* at 665–67.

In order to properly pursue a motion for summary judgment, the Government "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The Government's evidence is inadequate to meet this initial threshold inquiry. Accordingly—as the evidence presented is inadequate to support the Government's motion in the first instance—summary judgment in favor of the Government

17

on this issue is inappropriate. *See id.*

Denial of the Government's summary judgment motion on this issue does not necessarily require me to grant Plaintiffs' cross-motion on the same question. *See Atlantic Richfield Co.*, 226 F.3d at 1148. Plaintiffs are still required to point to evidence they believe demonstrates the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323. Plaintiffs meet this threshold inquiry by their proffer of testimony before Congress speaking to the precise issue raised—testimony that stated suppression of reliance parties' First Amendment rights in the United States was unlikely to lead to suppression of foreign reliance parties' rights as they concern United States works in foreign nations. *See* Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment, Part III.B.2 [**Docket # 150**].

Although the Government had the opportunity to present evidence that was contrary to Plaintiffs' supported position, it did not do so. I therefore assume, for purposes of Plaintiffs' motion, that no such evidence exists. *See Atlantic Richfield Co.*, 226 F.3d at 1148. As the burden remains on the Government to present specific evidence showing it has a significant interest that is protected by limiting Plaintiffs' speech and that Section 514 does not burden substantially more speech than necessary to further the Government's interest, the Government's failure to muster such evidence shows no question of material fact remains to be determined on this issue. *See Turner I*, 512 U.S. at 664–65; *Celotex*, 477 U.S. at 323; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Summary judgment in Plaintiffs' favor on this issue is therefore appropriate.

### C. Correction of Historic Inequities

The Government's third proffered justification is that Section 514 "serves an important

equitable interest—the restoration of copyright protection to authors of foreign origin who lost their United States copyrights through no fault of their own, either because they failed to comply with United States copyright formalities, or because the United States did not have copyright relations with their nations at the time they created their works."

Although neither party argues this point in any detail, the *amicus* brief filed in support of the Government's position [**Docket # 152**] concedes an important point raised by Plaintiffs—namely, that Section 514 extends protections to foreign authors that are not afforded United States authors, even in their own country. Rather than correct an historic inequity, Section 514 appears to create an inequity where one formerly did not exist. The Government proffers no evidence showing how granting foreign authors copyrights in the United States—yet denying similar protections to United States authors—could constitute an important Government interest. Indeed, this rationale appears inconsistent with the Government's overarching argument that restoring copyrights to foreign authors is an important Government interest for the simple reason that it will afford United States authors more copyright protection. As Plaintiffs' position remains unrebutted by the Government, summary judgment in Plaintiffs' favor is also appropriate on this issue.

## V. CONCLUSION

Congress has a legitimate interest in complying with the terms of the Berne Convention. The Berne Convention, however, affords each member nation discretion to restore the copyrights of foreign authors in a manner consistent with that member nation's own body of copyright law. In the United States, that body of law includes the bedrock principle that works in the public domain remain in the public domain. Removing works from the public domain violated

Plaintiffs' vested First Amendment interests. In light of the discretion afforded it by the Berne Convention, Congress could have complied with the Convention without interfering with Plaintiffs' protected speech. Accordingly—to the extent Section 514 suppresses the right of reliance parties to use works they exploited while the works were in the public domain—Section 514 is substantially broader than necessary to achieve the Government's interest.

On the basis of the record before the Court, I conclude no evidence exists showing whether the Government's two additional justifications for implementing Section 514—Section 514 helps protect the copyright interests of United States authors abroad; and Section 514 corrects for historic inequities wrought on foreign authors who lost their United States copyrights through no fault of their own—constitute important Government interests, or whether Section 514 is narrowly tailored to meet those interests.

Accordingly, the Government's motion [**Docket # 147**] is DENIED; Plaintiffs' motion [**Docket # 148**] is GRANTED.

Dated: April  3 , 2009.

BY THE COURT:

   s/Lewis T. Babcock
Lewis T. Babcock, Judge